**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| MATTHEW J. TURNER, Regional Director of the Tenth Region, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, <br><br> Petitioner <br><br> v. <br><br> FOXY LOXY PRINT GALLERY & CAFE, LLC, FOXY BAKERY, LLC D/B/A HENNY PENNY ART SPACE & CAFE, AND FOX & FIG, LLC AS A SINGLE EMPLOYER, <br><br> Respondent | ) <br> ) <br> ) <br> ) Civil Action No.: <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF PETITION FOR PRELIMINARY INJUNCTION UNDER SECTION 10(j) OF THE**
**NATIONAL LABOR RELATIONS ACT**

---

## I. STATEMENT OF THE CASE

Foxy Loxy Print Gallery & Cafe LLC ("Foxy Loxy"), Foxy Loxy Bakery LLC d/b/a Henny Penny Art Space & Cafe ("Henny Penny"), and Fox & Fig, LLC ("Fox & Fig") (collectively "Respondent") illegally disciplined and discharged 13 employees after they engaged in a lawful strike seeking improved pay and working conditions. Given Respondent's retaliatory actions, the remaining employees are now fearful of engaging in protected activities, including activities in support of the Union of Southern Service Workers an affiliate of Service Employees International Union ("the Union").[1]

---

[1] This memorandum exceeds the 26-page limit as specified in Local Rule 7.1. Petitioner has contemporaneously filed a motion to exceed page limits and included a proposed order as required by the Local Rules.

Lisa Y. Henderson, Regional Director of Region 10 of the National Labor Relations Board ("Petitioner" or "Regional Director") issued a complaint on May 14, 2024, after investigating the unfair labor practice charges filed by the Union in Cases 10-CA-323297, 324201, and 326729.[2] The Complaint alleges that Respondent violated Section 8(a)(1) and (3) of the National Labor Relations Act ("the Act") by its above and other unlawful conduct. The administrative hearing concerning the allegations in the complaint began on August 13, 2024, and closed on August 16, 2024.

While awaiting a final order from the National Labor Relations Board ("the Board"), Petitioner is before this Court on a Petition for Preliminary Injunction filed for and on behalf of the Board pursuant to Section 10(j) of the Act, which authorizes the Board, "upon issuance of a complaint … charging that any person has engaged in or is engaging in an unfair labor practice," to seek temporary injunctive relief from the United States District Court for the District "wherein the unfair labor practice in question is alleged to have occurred."[3]

Given that enforcement of a final Board Order is likely years away, without immediate injunctive relief, Respondent's illegal efforts will succeed and employees' protected activities and support for the Union will be forever chilled—permanently thwarting the intent of Congress, the Board's remedial authority, and the employees' exercise of their federal statutory rights. Therefore, to prevent irreparable harm to employees' rights and the Board's remedial powers, Petitioner respectfully requests that this Court issue a preliminary injunction to enjoin Respondent from

---

[2] On October 31, 2024, former Regional Director Lisa Y. Henderson retired from the Board. On November 4, 2024, Matthew J. Turner was appointed as Regional Director of Region 10 by the Board and General Counsel Jennifer Abruzzo, and is the current Regional Director.

[3] 29 U.S.C. § 160(j).

further violations pending Board adjudication of the complaint, to require Respondent to offer interim reinstatement to the discriminatees, and to publicly post and read this Court's Order to notify employees of the Court's protection of their rights.

## II. <u>STATEMENT OF FACTS</u>

### A. Background

Foxy Loxy, Henny Penny, and Fox & Fig were a trio of restaurants located in Savannah, Georgia. Foxy Loxy is a coffee shop, bakery, and Tex-Mex cantina; Henny Penny is a family-friendly art space offering coffee and baked goods; and Fox & Fig was a vegan restaurant before it permanently closed in November 2023. (Ex. 12, Tr. 566-70).[4]

Respondent admits it is a single employer within the meaning of the Act, as it has common ownership and management, uniform rules and policies, and shared communication channels such as Slack. (Ex. 15, GC Ex. 1(o), 1(w); Ex. 10, Tr. 12, 30; Ex. 12, Tr. 579, 563-65; Ex. 14, J Ex. 1).

### B. Union Campaign Begins Early Spring and Continues Through Late Summer

In March 2023,[5] Juniper (or Juno) Ambrose[6] an employee at Foxy Loxy, contacted the Union about organizing their workplace. (Ex. 10, Tr. 25; Ex. 12, Tr. 503). Union organizer Ashley Venerable responded to Ambrose and the two organized and held many videoconference meetings between May and August for employees to discuss unionization. (Ex. 10, Tr. 26, 128, 181). These meetings included employees from all three restaurants. (Ex. 10, Tr. 25-26). Employees also

---

[4] Included with Petitioner's filings is a series of exhibits from the administrative record. Citations will note the exhibit number as filed followed by the related transcript page as "Tr. xx" or the related internal Joint exhibit "J Ex. xx", General Counsel Exhibit "GC Ex. xx", or Respondent Exhibit "R Ex. xx".

[5] All dates hereinafter are in 2023 unless otherwise specified.

[6] Juniper Ambrose is named in the complaint as Samantha Hughes. They testified that their preferred name is Juniper Ambrose.

created a channel on Signal, an encrypted messaging service, to serve as a forum for their organizing efforts. (Ex. 10, Tr. 26, 128). With the help of the Union, the employees then drafted a list of demands to incorporate into a letter they planned to deliver at each restaurant regarding their terms and conditions of employment. (Ex. 10, Tr. 26, 129, 222; Ex. 15, GC Ex. 2).

### C.  July 21: Union Advocates Deliver Demand Letter to Management In Person

On July 21, a group of employees, including Ambrose, Jonathan "Jonie" Garmendez, and Alice Ross, delivered the demand letter in person to Foxy Loxy and Fox & Fig, accompanied by Venerable and another Union representative. (Ex. 10, Tr. 27, 29, 182). At Foxy Loxy, Ambrose, Garmendez, and others read the letter to the staff and posted it on a corkboard in the office as there was no supervisor present to accept it. (Ex. 10, Tr. 27). The employees then went to Fox & Fig. (Ex. 10, Tr. 29). Garmendez read and delivered the letter to General Manager Steph Tarnowski. (Ex. 10, Tr. 29, 222). Tarnowski informed Director of Operations Julie Kaufman, who also saw the demand letter posted on the corkboard at Foxy Loxy. (Ex. 12, Tr. 574-75). On July 21, Kaufman called CEO and Owner Jennifer Jenkins to let her know that the employees delivered the demand letter. (Ex. 12, Tr. 571-72, 575).

The letter stated that employees, with the support of the Union, were demanding improvements to working conditions, such as paid sick leave, full-time hours, and a fair grievance process, and requested a virtual meeting with Jenkins to discuss the demands. (Ex. 15, GC Ex. 2). It was signed by 40 employees of Foxy Loxy, Henny Penny, and Fox & Fig. (Ex. 15, GC Ex. 2).

### D.  Management's Negative Response to Employees' July 21 Demand Letter

Neither CEO Jenkins nor Director Kaufman directly responded to the letter or the employees' demands. However, on July 26, Jenkins posted a message on Respondent's Slack channels addressing employees about the Union drive. (Ex. 10, Tr. 30; Ex. 15, GC Ex. 3). In

pertinent part, Jenkins implied that unionizing would be futile for employees, remarking that no union "can get more than what the company is able to give and we have been giving to our teams beyond our means since COVID." (Ex. 15, GC Ex. 3). On July 29, lead Union advocate Ambrose emailed both Jenkins and Kaufman asking to meet. (Ex. 16, R Ex. 6). Kaufman replied that no representatives of Respondent would be attending such a meeting. (Ex. 12, Tr. 578; Ex. 16, R Ex. 6). On August 1, Jenkins posted another message on Slack in which she explained that the restaurants were not making money, and that she only made a modest income from them, as demonstrated by profit-and-loss summaries that she attached to the post. (Ex. 15, GC Ex. 4; Ex. 16, R Ex. 4).

### E. August 5: Employees Go on Strike for Better Pay and Working Conditions

On August 5, employees at Foxy Loxy, Henny Penny, and Fox & Fig went on strike. Beginning at 11:21 am, the Union sent a series of strike notice emails to Respondent identifying employees who were going on strike, beginning with the names of nine employees and adding names as the day went on and additional employees joined the strike. (Ex. 12, Tr. 507; Ex. 15, GC Exs. 6, 32). The notices announced that employees were going on a one-day strike to demand better working conditions and offered to return to work unconditionally for their next regularly scheduled shift. (Ex. 15, GC Exs. 6, 32). The first strike notice email listed the following nine employees: Kole Cox, Garmendez, Ross, Andrea Guzman, Absalom Jackson, Kai Kennedy, Chrush Jalen,[7] Sabrina Clausen, and Isabella Mashack. (GC Ex. 32 pg. 7).[8]

---

[7] Chrush Jalen is the preferred name for employee Christian Deveaux.

[8] It is worth noting that Respondent terminated all nine of these employees regardless of their activities on the day of the strike.

At around 12:00 pm, a group of around 15 to 20 striking employees and Union organizers rallied at Foxy Loxy. (Ex. 10, Tr. 41; Ex. 12, 508). Juniper Ambrose and five other employees went inside to deliver a strike notice to Manager Kai Simms. (Ex. 10, Tr. 41; Ex. 11, Tr. 385, 438). The others remained outside chanting and holding signs. Two employees walked out and joined the strike. (Ex. 10, Tr. 42). The strikers and organizers then proceeded to Henny Penny, where Ambrose and three other strikers went inside to deliver a strike notice but found no manager present. (Ex. 10, Tr. 44). Three employees from Henny Penny joined the strike and the group moved on to Fox & Fig. (Ex. 10, Tr. 44; Ex. 11, Tr. 265, 283). As with the other locations, Ambrose and a small group of strikers went inside to deliver the strike notice to Manager Tarnowski and some employees left the restaurant to join the strike. (Ex. 10, Tr. 52, 140, 231). Strikers then gathered across the street from Fox and Fig at Troup Square, a public plaza, for a rally, where a few employees gave speeches and press interviews, and strikers chanted while waving signs. (Ex. 10, Tr. 54, 141). Although employees used two bullhorns during the strike, they did not use them inside the restaurants. Strikers did not block entrances or exits, engage in acts of violence, or use profane or threatening language. (Exs. 10, 11, 12, 15, 16). Strikers did not interact with customers, although some customers left when they saw a strike was happening. (Exs. 10, 11, 12, 15, 16). In sum, the evidence shows that the strikers were at each location for five to ten minutes. The evidence also shows that the entire strike before entering Troup Square lasted about an hour.

### F. Respondent Immediately Terminates 10 Strike Participants that Same Day

Within hours of the strike, Respondent emailed copies of Georgia Department of Labor Separation Notices to nine of the employees who participated in the strike: Zachary Boykin, Clausen, Cox, Jalen, Garmendez, Ambrose, Mashack, Troy Nelson, and Rose Waldron (collectively, "the initial nine discriminatees"). (Exs. 15, GC Exs. 8, 10, 15-21). These Notices

6

informed them that they were discharged for unacceptable workplace conduct and would not be permitted on the premises of any of the restaurants. The initial nine discriminatees included some of those who were most active in the organizing campaign and some of those who entered the stores to deliver strike notices. Five of them were also among the employees named in the first strike notice sent on August 5. (Ex. 15, GC Ex. 32). Shortly after the discharges, CEO Jenkins sent a Slack message to employees addressing the events of that day. (Ex. 15, GC Ex. 9). Jenkins stated that striking employees "entered three locations and disrupted business," were "loud" and "upset customers." She described the strike as a "disruption" that "was not done in good faith and was unlawful." Accordingly, Jenkins announced that "[t]hose who participated in this unlawful disruption have been terminated for that reason." (Ex. 15, GC Ex. 9).

Jenkins's Slack message followed directly after a Slack message from Ambrose earlier that day, which stated that employees were on strike because their request for a conversation with management was rejected. (Ex. 15, GC Exs. 7, 9).

In addition to the nine discriminatees, Respondent also emailed a Georgia Department of Labor Separation Notice to employee Absalom Jackson on August 5. (Ex. 14, J Ex. 4). On the day of the strike, Jackson was scheduled for both a morning and an afternoon shift. (Ex. 12, Tr. 494-95). At roughly 11:00 a.m., Foxy Loxy Manager Kai Simms called Jackson to ask why he was not at work and warned him that he could be fired. (Ex. 12, Tr. 495-96). Jackson dismissed the warning and hung up. (*Id.*). At 11:21 a.m., the Union sent out the first strike notice. (Ex. 15, GC Ex. 32). Although he did not take part in the picketing activities, Jackson's name was included on the first strike notice, and he participated in the strike by not working on August 5. (Ex. 12, Tr. 494). The Separation Notice, signed by Director Kaufman, stated that Jackson was discharged for being a no-call/no-show for his two scheduled shifts that day. (Ex. 14, J Ex. 4).

### G. August 8: Respondent Terminates Two Additional Strike Participants

On August 8, Respondent discharged employees Andrea Guzman and Kai Kennedy, who had been named on the first strike notice the Union sent on August 5 and did not work their shifts that day, but also did not participate in any of the picketing activities.[9] (Ex. 12, Tr. 415, Tr. 483; Ex. 15, GC Ex. 32). After Guzman's shift ended on August 8, Manager Kai Simms and Director Kaufman called her into a meeting. (Ex. 12, Tr. Tr. 417-18). Kaufman told Guzman that she was discharged for being a no-call/no-show on August 5. (*Id.*). Respondent's disciplinary form documenting Guzman's discharge also cited past attendance issues and excessive cell phone usage during work time. (Ex. 14, J Ex. 2). However, Guzman had received only one write-up for excessive cell phone usage, which Respondent issued to her a year prior, on July 25, 2022. (Ex. 16, R Ex. 9). Similarly, the last discipline regarding attendance that Guzman received in the past year was a single verbal warning on June 13. (*Id.*).

Like Guzman, Kennedy was called into a meeting with Simms and Kaufman after her shift on August 8, where Kaufman told her she was being discharged for being a no-call/no-show on August 5. (Ex. 12, Tr. 485-486; Ex. 14, J Ex. 3). Kennedy had no prior disciplinary history. (Ex. 23, Tr. 487).

### H. August 9: Respondent Disciplines and Terminates Another Strike Participant

On August 9, Manager Tarnowski called Alice Ross—a Fox & Fig employee, and one of the leaders of the Union campaign—into a meeting with herself and Director Kaufman. (Ex. 10, Tr. 192; Ex. 12, Tr. 643). Ross was openly supportive of the organizing efforts, posting about it

---

[9] Respondent applied its Employment At-Will, Disciplinary Action, and Call Out handbook policies to Guzman and Kennedy. With respect to Guzman, Respondent also applied its Attendance & Tardiness and Company Phone Usage and Personal Cell Phones policies as additional justifications for her discharge.

on social media and, on the day of the strike, sending messages on Respondent's Slack channels about why employees were striking, what their demands were, and encouraging other employees not to be afraid to speak up. (Ex. 15, GC Ex. 11; Ex. 16, R Ex. 3). At the meeting, Kaufman issued two write-ups to Ross: one for being late in April and one for violating the Social Media and Solicitation & Distribution policies contained in the employee handbook. (Ex. 10, Tr. 192). During the previous week, Ross had shared stories on Instagram about organizing, including a link to support the August 5 strike and the discharged strikers. (Ex. 15, GC Ex. 11). Kaufman informed Ross that she violated the social media policy by speaking ill of the company.[10] (Ex. 10, Tr. 203, 214). During the hearing, Kaufman claimed that Ross violated the Social Media policy by excessively using her personal cell phone on work time and in work areas. (Ex. 12, Tr. 646). Respondent also asserted that Ross violated the Solicitation & Distribution policy by collecting Union authorization cards and soliciting coworkers on behalf of the Union while at work. (Ex. 12, Tr. 647). Ross, however, had previously engaged in other solicitations on behalf of her band— inviting coworkers and supervisors to shows and sharing her latest albums with them—on work time and was never reprimanded. (Ex. 13, Tr. 699-700). Other employees also engaged in similar solicitations on behalf of their own artistic endeavors without reprimand. (*Id.*).

Director Kaufman warned Ross during the August 9 meeting that, according to the Disciplinary Action handbook policy, three write-ups would result in immediate discharge. Respondent also told Ross that she had two strikes and was on a final notice. (Ex. 10, Tr. 205).

---

[10] Respondent's Social Media policy prohibits online conduct that "adversely affects" Respondent's business interests or "disparage[s] customers, members, employees, or suppliers," and instructs employees to "resolve work-related complaints by speaking directly with their coworkers" or using Respondent's internal complaint procedures rather "than by posting complaints" on social media.

On September 19, Director Kaufman sent Ross an email with a final write-up for purported poor performance, refusing to perform tasks, and following improper timeclock procedures. (Ex. 15, GC Ex. 14). The write-up stated that, on September 13, Ross clocked out a half an hour later than her scheduled time. (*Id.*). Because this was her third write-up, Respondent discharged Ross in accordance with Respondent's Disciplinary Action policy. (*Id.*).

## I.   Union Campaign Stalls as a Result of Respondent's Unfair Labor Practices

At the administrative hearing, lead employee organizer Ambrose testified that after the strike and ensuing discharges, their former coworkers who were not discharged for their involvement in the strike reported that Respondent's managers warned them not to take part in such activities again. (Ex. 10, Tr. 61). Employee Cox testified that Respondent's retaliatory discharges caused the organizing effort to fall apart. (Ex. 10, Tr. 144). Those he knew who still worked at Foxy Loxy, though they agreed with the points made by the strikers, felt intimidated and feared losing their jobs if they tried to do anything related to the Union. (*Id.*). Similarly, Ross testified that, while she continued trying to organize at Fox & Fig after the strikers were discharged in early August, her coworkers were afraid that participating in any Union activity could get them discharged too. (Ex. 10, Tr. 204-05). Nonetheless, Ross testified that she believed the Union campaign was not completely extinguished. (Ex. 10, Tr. 205). If the discharged strikers were reinstated, Ross testified that employees would be able to continue their organizational efforts. (*Id.*).

## III.   THE STATUTORY SCHEME PURSUANT TO WHICH SECTION 10(j) INJUNCTIVE RELIEF IS SOUGHT

Section 10(j) of the Act[11] authorizes United States district courts to grant temporary

---

[11] 29 U.S.C. § 160(j). Section 10(j) provides:

The Board shall have power, upon issuance of a complaint as provided in subsection

injunctions pending the Board's resolution of unfair labor practice proceedings. As the Supreme Court has stated, because "the Board's administrative proceedings take years, Congress vested the Board with authority to seek a preliminary injunction in federal court while the proceedings unfold" since in many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint, thereby rendering a final Board order ineffectual.[12] Thus, Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation. "The court must evaluate the traditional equitable criteria through the prism of the underlying purpose of Section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power."[13]

### A. Likelihood of Success on the Merits

Likelihood of success in a Section 10(j) proceeding is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Petitioner

---

(b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

[12] *Starbucks Corp. v. McKinney*, 602 U.S. 339, 343 (2024). *See Chester v. Grane Healthcare Co.*, 666 F.3d 87, 92-93 (3d Cir. 2011) (citing S. Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947), *reprinted at*, *I Legislative History of the Labor Management Relations Act of 1947*, 414, 433 (Government Printing Office 1985)). *See also Arlook ex rel. NLRB v. S. Lichtenberg & Co.*, 952 F.2d 367, 371 (11th Cir. 1992) (Section 10(j) was enacted "because administrative resolution was so time-consuming that guilty parties could violate the Act with impunity during the years of pending litigation, thereby often rendering a final order ineffectual or futile." (cleaned up)); *Hoffman v. Inn Credible Caterers*, 247 F.3d 360, 368 (2d Cir. 2001) ("One of the underlying purposes of [Section] 10(j) is to preserve the status quo in order to protect employees' statutory collective bargaining rights.").

[13] *Frankl*, 650 F.3d 1344, 1355 (9th Cir. 2011).

occurred and that the court of appeals would grant a petition enforcing that order.[14] Therefore, in a Section 10(j) proceeding, the district court should grant injunctive relief if it determines that the case before the Board "is likely to succeed on the merits."[15] However, the Petitioner need not show a certainty of winning.[16]

### B. Likelihood of Irreparable Harm Absent Interim Relief

Likely irreparable injury is established in a Section 10(j) case by showing "a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief."[17] Petitioner can make the requisite showing of likely irreparable harm either through evidence that such harm is occurring,[18] or from "inferences from the nature of the particular unfair labor practice at issue [which] remain available."[19]

Continuing Section 8(a)(5) violations involving the failure to bargain in good faith and Section 8(a)(3) violations involving the unlawful discharge of union supporters have "long been understood as likely causing an irreparable injury to union representation."[20] "[E]ven if the Board subsequently orders a bargaining remedy or reinstatement of the supporters, the union is likely weakened in the interim, and it will be difficult to recreate the original status quo with the same

---

[14] *Id.*; *see also Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1187 (9th Cir. 2011).

[15] *Starbucks Corp.*, 602 U.S. at 345 (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

[16] *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981) ("likelihood of success" does not equate to "success.").

[17] *Frankl*, 650 F.3d at 1362. *See also Winter*, 555 U.S. at 22 (A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury, but instead it must be demonstrated that the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.)

[18] *See, e.g.*, *Scott v. Stephen Dunn & Assoc.*, 241 F.3d 652, 667-68 (9th Cir. 2001).

[19] *Frankl*, 650 F.3d at 1362.

[20] *Id*. *See also Small*, 661 F.3d at 1191.

relative position of the bargaining parties. That difficulty will increase as time goes on."[21]

### C.  Whether the Balance of Equities Favors Interim Relief

"In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"[22] Courts must consider the matter in light of the underlying purpose of Section 10(j), which is "to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge."[23] Therefore, in balancing the equities, district courts must take into account the probability that declining to issue an injunction will permit "an alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority."[24]

### D.  Whether Interim Relief is in the Public Interest

The public interest in a Section 10(j) case is to prevent remedial failure and protect employee rights by ensuring "that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge."[25]

Petitioner satisfies each of the above-described equitable criteria. A preliminary injunction is required here to protect the employees' statutory rights in the public interest and preserve the remedial authority of the Board.

### IV. <u>INJUNCTIVE RELIEF IS WARRANTED</u>

---

[21] *Frankl*, 650 at 1363.

[22] *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987)).

[23] *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 452 (9th Cir. 1994), *abrogated on other grounds by Winter*.

[24] *Starbucks Corp.*, 602 U.S. at 362 (Jackson, J., concurring in part) (citing *Frankl*, 650 F.3d at 1362). *See also Small*, 661 F.3d at 1191; *Miller*, 19 F.3d at 459-60.

[25] *Frankl*, 650 F.3d at 1365 (quoting *Miller,* 19 F.3d at 460). *See also Small*, 661 F.3d at 1197.

### A.  Petitioner Has Made a Clear Showing that Success on the Merits is Likely

#### 1.  Petitioner Has a Strong Likelihood of Success in Showing that Respondent Violated Section 8(a)(1) and (3) of the Act by Terminating 13 Employees who Participated in the Lawful August 5 Strike

There is a strong likelihood that the ALJ and Board will find that Respondent violated Section 8(a)(1) and (3) of the Act, as alleged in the administrative complaint, when it disciplined and terminated employees for engaging in the August 5 Strike to protest their terms and conditions of employment. Section 8(a)(1) is violated if a respondent knows of its employees' concerted activity, if the activity is protected by the Act, and if adverse employment action is motivated by the employees' protected concerted actions.[26] Section 7 of the Act gives employees the right to peacefully strike, picket, and engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.[27]

In this case, the employees were engaged in union and protected concerted activities when they went on strike on August 5. They communicated their group concerns regarding wages, benefits, and other terms and conditions of their employment to their supervisors in writing on July 21 and on again on August 5.[28] The August 5 strike notice explicitly informed management of the strike and the protected reasons for the strike. The employees were supported by the Union in going on strike and communicated in both their demand letter and strike notice that the Union supported their activities. Respondent knew of the demand letter and the strike notice. Respondent

---

[26] *Kysor Indus. Corp.*, 309 NLRB 237, 237 (1992).

[27] *Clear Pine Mouldings*, 268 NLRB 1044, 1045 (1984).

[28] Wages are a "vital term and condition of employment," and the "grist on which concerted activity feeds"; discussions of wages are often preliminary to organizing or other action for mutual aid or protection. *Aroostook County Regional Ophthalmology Center*, 317 NLRB 218, 220 (1995) (citations omitted), *enf. denied in part on other grounds*, 81 F.3d 209, 214 (D.C. Cir. 1996).

also knew that the employees were on strike because of their concerns over wages, benefits, and other terms and conditions. Respondent also knew that the employees were acting with the support of the Union. On the evening of August 5, Respondent terminated nine strikers in retaliation for their decision to exercise their Section 7 rights by going on strike.

For the initial nine discriminatees, Respondent admits that it discharged them because they went on strike.[29] Thus, the only question is whether the employees lost protection of the Act while on strike on August 5. In order for an employee's alleged strike misconduct to warrant discipline or termination, the employer must first establish that it has a genuine belief that the striker engaged in some form of serious misconduct.[30] Although that belief may be based on hearsay sources, such as the reports of non-striking employees, supervisors, and security guards, the evidence must nevertheless link the specific striker to the specific acts of misconduct.[31]

The current standard for evaluating strike misconduct is set forth in *Clear Pine Mouldings*.[32] The *Clear Pine Mouldings* standard is an objective one and does not involve an inquiry into the strikers' intentions or whether any particular employee was actually coerced or intimidated by the strikers.[33] It is appropriate to consider all the circumstances in which the alleged misconduct occurred, including other instances of vandalism, threats, and violence during the

---

[29] Ex. 15, GC Ex. 9.

[30] *Universal Truss*, 348 NLRB 733, 734 (2006).

[31] *Id.* (citing *Avery Heights*, 343 NLRB 1301, 1304 (2004), *vacated on other grounds*, 448 F.3d 189 (2d Cir. 2006)).

[32] 268 NLRB 1044 (1984).

[33] *Kapston Paper & Packaging Corp.*, 366 NLRB No. 63, slip op. 1, n.4 (2018); *Mohawk Liqueur Co.*, 300 NLRB 1075 (1990).

course of a strike.[34]

In this case, none of the employees engaged in any misconduct that would deprive them of the protection of the Act. The employees who entered the stores did not engage in disruptive activities that interfered with Respondent's businesses. All record evidence shows that the employees who entered the stores remained calm and quiet while briefly inside of the stores. Furthermore, Respondent did not present any evidence linking any specific alleged misconduct to any specific employee.[35]

Likewise, the strikers did not lose protection of the Act while chanting outside of Henny Penny or Fox and Fig. The record evidence, including all testimony, shows that the protesters chanted peacefully outside of the stores and did not use profane language. There is no evidence of violence, property damage, threats, or any other possible serious misconduct. There is no evidence that Respondent (or anyone else) asked the protesters to leave or move at all. This is likely because the protests, at each location, lasted for just a few minutes and took place on public sidewalks. As noted above, Section 7 of the Act protects the right of workers to peacefully protest their working conditions. In this case, that is all the protesters did.

Respondent also terminated Jackson, Guzman, Kennedy and Ross because they

---

[34] *Universal Truss*, 348 NLRB at 735.

[35] *Compare NLRB v. Goya Foods of Fla.*, 525 F.3d 1117, 1127 (11th Cir. 2008) (labor protest inside store did not lose Act's protection because it was relatively brief, peaceful, and employees themselves did not engage in objectionable behavior), *and Thalassa Restaurant*, 356 NLRB 1000, 1001 n.3 (2011) (employee who briefly entered restaurant with group of nonemployees to deliver grievance letter did not disturb patrons, block their movements, or interfere with working employees), *with Restaurant Horikawa*, 260 NLRB 197, 197-98 (1982) (finding employee who was part of group of 30 initially engaged in a protected demonstration outside the restaurant, but then lost the Act's protection when they entered the restaurant and "paraded boisterously about" during the dinner hour for about 15 minutes), *and Honda of Mineola*, 218 NLRB 486, 486 n.3 (1975) (employees lost Act's protection by assembling en masse in employer's showroom, blocking customer access, and refusing to leave), *enfd.*, 542 F.2d 1165 (2d Cir. 1976).

participated in the strike on August 5. Rather than admitting that their strike activity was the reason for their terminations, Respondent claimed that it disciplined and terminated them because they violated various handbook policies. However, the record evidence shows that Respondent retaliated against all four of these individuals because they engaged in union and protected concerted activity.

When an employer claims it had a lawful reason for issuing an adverse employment action rather than any discriminatory motive, the Board applies the analysis set forth in *Wright Line*.[36] The *Wright Line* framework requires proof that an employee's union or other protected activity was a motivating factor in the employer's action against the employee.[37] The elements required to support such a showing are union or protected concerted activity, employer knowledge of that activity, and union animus on the part of the employer.[38]

If the General Counsel meets her initial burden, the burden shifts to the employer to prove by a preponderance of the credible evidence that it would have taken the adverse action, even absent the protected activity.[39] The employer must then prove by a preponderance of the credible evidence that it would have discharged the employees even in the absence of their union and protected concerted activity.[40] To do so, the employer must show that it consistently and non-

---

[36] 251 NLRB 108 (1980), *enfd.*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982).

[37] *Id.*

[38] *General Motors*, 369 NLRB No. 127, slip op at 15. (2020); *Consolidated Bus Transit,* 350 NLRB 1064, 1065 (2007), *enfd.*, 577 F.3d 67 (2d Cir. 2009).

[39] *See, e.g.*, *Mesker Door*, 357 NLRB 591, 592 (2011).

[40] *T & J Trucking Co*., 316 NLRB 771 (1995); *Manno Electric, Inc*., 321 NLRB 278, 280 n.12 (1996).

discriminatorily applied its disciplinary rules.[41]  The employer's treatment must show that it has similarly disciplined employees not engaged in protected activity for similar offenses.[42]

Each of the *Wright Line* elements exist for these four employees. All four employees openly engaged in union and protected concerted activities by, among other actions, participating in the strike and including their names on the initial strike notice that the Union emailed to Jenkins and Kaufman. Respondent knew of the employees' protected activities and in all four cases it responded with disciplinary action within four days of the strike.

Furthermore, Respondent cannot show that it would have taken the same action of terminating any of the four employees absent their union and protected concerted activity. It is undeniable that Respondent terminated Jackson, Guzman, and Kennedy for missing shifts after the Union gave notice that they were on strike. Respondent cannot show that it would have taken the same adverse action absent their protected activity because Respondent terminated them directly in response to their protected activity of going on strike for one day. Respondent also failed to provide any evidence of comparable discipline. Respondent did not show that it had ever terminated any other employee (who was not actively engaged in protected activity) because they were a no-call/no-show.

The evidence also establishes that Respondent unlawfully retaliated against Ross after she participated in the August 5 strike. This is most clear from the August 9 discipline meeting and write-ups, but it is also the case that Respondent's decision to terminate Ross on September 19, based on pretextual reasons, was a further example of retaliatory discipline.

---

[41]  *Septix Waste, Inc*., 346 NLRB 494, 496 n.15 (2006).

[42] *Marathon Le Tourneau Co. v. NLRB*, 256 NLRB 350 (1981), *enfd*., 699 F.2d 248, 252-53 (5th Cir. 1983).

On September 19, Respondent sent Ross an email with her termination notice attached. (Ex. 15, GC Ex. 14). The disciplinary document included the write ups from August 9, but also added that Ross violated Respondent's policies by refusing to do tasks, performing poorly, and improperly clocking out. Respondent did not speak with Ross about these issues prior to terminating her by email. Prior to August 5, Respondent never issued Ross a written warning. Respondent Exhibit 10 (Ex. 16, R Ex. 10) shows that Ross received numerous verbal warnings prior to August 2023. However, it was only *after* the August 5 strike that similar infractions resulted in write ups and termination. Furthermore, Respondent provided no evidence that any other employees were written up and consequently terminated for similar reasons. Respondent also did not show that it had ever terminated an individual for such minor infractions without first holding a disciplinary meeting with them.

Review of the applicable case law demonstrates that the Regional Director has established, and the Board is likely to find, that Respondent violated the Act by terminating employees for engaging in protected concerted activities and union activities. The employees protested terms and conditions of employment when they engaged in a protected strike supported by the Union. Respondent could not lawfully discipline employees for the strike unless the employees lost the protection of the Act. As employees did not lose protection of the Act, Respondent violated Section 8(a)(3) and (1) by terminating employees for participating in the August 5 strike.

### 2. Petitioner Has a Strong Likelihood of Success in Showing that Respondent Violated Section 8(a)(1) With Its Coercive Statements and Unlawful Policies

There is also a strong likelihood that the ALJ and Board will find that Respondent violated Section 8(a)(1) of the Act, as alleged in the administrative complaint, by its various coercive statements, unlawful communications, unlawful polices, and unlawful application of rules.

Specifically, Respondent repeatedly violated Section 8(a)(1) through CEO Jenkins' Slack

communications to the employees on July 26, August 4, and August 5, and by Director Kaufman's statements to employee Ross on August 9. By posting on July 26 that no union could get from Respondent what they could not give, Jenkins essentially told employees that their organizing efforts were futile.[43] Finally, on August 5, Jenkins coerced employees in the exercise of their Section 7 rights by stating that Respondent had discharged the nine discriminatees for striking.[44] In the disciplinary meeting with Ross on August 9, Kaufman echoed Jenkins' rhetoric that unionizing would not benefit employees, then threatened that employees may lose benefits like paid time off[45] and the restaurants might close if employees organized.[46]

Further, there is a strong likelihood of showing Respondent violated Section 8(a)(1) by unlawfully applying employee handbook rules to restrict employees' Section 7 activities and by

[43] *See NLRB v. Allied Med. Transp.*, 805 F.3d 1000, 1007-08 (11th Cir. 2015) (employer "illegally interfered with employees' union activities in violation of [S]ection 8(a)(1)" by telling employee that "electing a union would be futile"); *NLRB v. Varo, Inc.*, 425 F.2d 293, 299 (5th Cir. 1970) (foreman's statements that the employer would never agree to a contract violated Section 8(a)(1) "since it warned of the futility of organization").

[44] *Cf. Collins Baking Co. v. NLRB*, 193 F.2d 483, 486 (5th Cir. 1951) (employer's president made unlawful threats by, in meetings with employees who were threatening to strike, telling them that if they went out on strike, the employer would consider them as having quit and would not take them back); *NLRB v. Laredo Coca-Cola Bottling Co.*, 613 F.2d 1338, 1341 (5th Cir. 1980) (after employees went on strike, employer's comments to newspaper that it would permanently replace all strikers constituted unlawful threats because the strikers were unfair labor practice strikers with an unconditional right of reinstatement).

[45] *See NLRB v. Henriksen, Inc.*, 481 F.2d 1156, 1162 (5th Cir. 1973) (coupled with employer's "expressed antiunion attitude," supervisors' statements that requesting time off would be "much different" and that employees' hours would be cut if employees unionized violated Section 8(a)(1)); *Hendrix Mfg. Co. v. NLRB*, 321 F.2d 100, 104-05 (5th Cir. 1963) (supervisors unlawfully told employees that if they voted in the union, they would not get bonuses or paid holidays, the employer would discontinue its profit-sharing plan, and the employer would more strictly enforce its time clock punch-out procedures).

[46] *See Weather Tamer, Inc. v. NLRB*, 676 F.2d 483, 488 (11th Cir. 1982) ("Clearly an employer's threat to close a plant if the employees vote to be represented by a union is a violation of [§] 8(a)(1)." (citing *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618-19 (1969)).

maintaining an unlawfully overbroad Social Media policy. Specifically, Respondent unlawfully applied the Employment At-Will, Disciplinary Action, and Call Out handbook policies to punish Guzman and Kennedy for participating in the strike by discharging them for their failure to adhere to those policies by being no-call/no-shows on the day of the strike.[47] With regard to Guzman, Respondent unlawfully applied the Attendance & Tardiness and Company Phone Usage and Personal Cell Phones policies in response to her Section 7 activities to manufacture additional justifications for her discharge.[48] Respondent's addition of previously undocumented attendance issues Additionally, Respondent unlawfully applied the Social Media and Solicitation & Distribution policies to restrict Ross's Section 7 activities by disciplining her for posting pro-Union content on social media[49] and for soliciting on behalf of the Union at work.[50] Indeed, Respondent had long tolerated non-Union solicitations by both Ross and her coworkers, with employees

---

[47] *See NLRB v. Marshall Car Wheel & F. Co.*, 218 F.2d 409, 416 (5th Cir. 1955) (acknowledging "correct general principle" that employer rule "barring absence without permission could not be discriminatorily applied or enforced so as to terminate an employee's status for engaging in a lawful strike"); *CGLM, Inc.*, 350 NLRB 974, 979-80 (2007), *enforced*, 280 F. App'x 366 (5th Cir. 2008) (employer's discharge of striking employees for not calling in or showing up for work amounted to a discharge for the act of going on strike and, accordingly, was unlawful).

[48] Record evidence shows that Respondent had never issued formal discipline to Guzman for attendance or tardiness issues prior to her participation in the August 5 strike. (Ex. 16, R Ex. 9). Additionally, Director Kaufman testified that Guzman violated the social media and phone use policies because Guzman was "on social media blasting the Company, tagging the Company on the clock." (Ex. 12, Tr. 641).

[49] *See N.W. Rural Elec. Coop.*, 366 NLRB No. 132, slip op. at 1 (2018) (employer unlawfully applied its "Attitude, Spirit and Cooperation" and confidentiality rules to restrict employee's Section 7 activities by discharging him for protected concerted posts on Facebook).

[50] *See NLRB v. Sunnyland Packing Co.*, 557 F.2d 1157, 1161-62 (5th Cir. 1977) (affirming Board's finding that no-solicitation rule was unlawful where rule was "specifically applied to unions alone" and other solicitations were "conducted by employees on company time and property without consequence"); *cf. NLRB v. Southwire Co.*, 801 F.2d 1252, 1256-57 (11th Cir. 1986) (finding employer violated the Act by not allowing union-related postings on its bulletin boards because employer disparately enforced its rules regarding appropriate postings).

regularly inviting colleagues and supervisors to their art shows or musical performances, posting fliers for their bands on the work bulletin board, and engaging in other solicitations on behalf of their personal endeavors.

Lastly, there is a strong likelihood of showing that Respondent's Social Media policy itself is unlawfully overbroad, which also provides an independent basis for finding that Ross's discipline pursuant to that policy violated Section 8(a)(1).[51] The Social Media policy's prohibition against online conduct that "adversely affects" Respondent's business interests or "disparage[s] customers, members, employees, or suppliers," and its instruction that employees "resolve work-related complaints by speaking directly with their coworkers" or using the Employers' internal complaint procedures rather "than by posting complaints" on social media would have a reasonable tendency to chill employees from exercising their Section 7 rights.[52] Because Respondent unlawfully maintained an overbroad social media rule, it further violated Section 8(a)(1) by disciplining employee Ross for breaching that rule because she had posted content on social media that supported the employees' organizing campaign.[53]

---

[51] *See Continental Group, Inc*., 357 NLRB 409, 412 (2011) (employer's discipline imposed pursuant to an unlawful rule is a violation of Section 8(a)(1) where the employee violated the rule by engaging in protected activities) (clarifying *Double Eagle Hotel & Casino*, 341 NLRB 112, 112 n.3 (2004), *enfd.*, 414 F.3d 1249 (10th Cir. 2005), *cert. denied*, 546 U.S. 1170 (2006)).

[52] *See Mercedes-Benz U.S. Int'l, Inc. v. NLRB*, 838 F.3d 1128, 1135 (11th Cir. 2016) (observing that an "ambiguous or overbroad rule that employees would reasonably understand to prohibit protected activity" is presumptively unlawful); *G4S Secure Sols. Inc. v. NLRB*, 707 F. App'x 610, 612-13 (11th Cir. 2017) (employer's insignia rule was an "overbroad rule that employees would reasonably understand to prohibit protected activity" and thus "presumptively unlawful under the Act") (internal citations and quotations omitted). *See also Stericycle, Inc.*, 372 NLRB No. 113, slip op. at 2 (2023) (rule that has reasonable tendency to chill employees from exercising their Section 7 rights, viewed from the perspective of employees economically dependent on their employer, is presumptively unlawful).

[53] *See, e.g.*, *Grill Concepts Services, Inc.*, 364 NLRB 385, 387 (2016) (finding employer violated Section 8(a)(1) and (3) by disciplining employees for violating unlawful rule that prohibited them

### B. Interim Injunctive Relief is Equitably Necessary to Prevent Irreparable Harm to Employees' Statutory Rights and the Board's Remedial Power

Congress has declared that "encouraging . . . collective bargaining" is the "policy of the United States."[54] Section 7 of the Act guarantees employees the right "to bargain collectively through representatives of their own choosing."[55] Making that choice "without restraint or coercion by their employer" is a "fundamental right."[56] Without interim relief, Respondent's illegal actions will irreparably harm the national policy encouraging collective bargaining, the employees' right to choose union representation, and the Board's remedial power. In short, Respondent will forever benefit from its unlawful conduct by effectively banishing the Union and its supporters from their restaurants.

Many Courts of Appeals, including the Eleventh Circuit, have recognized that the discriminatory discharge of union activists may effectively nip an organizing campaign in the bud absent interim relief.[57] The discharge of union supporters creates a leadership void sufficient to

---

from wearing union buttons at work); *Dish Network, LLC v. NLRB*, 725 F. App'x 682, 690-91 (10th Cir. 2016) (enforcing Board finding that employer had violated Section 8(a)(1) by disciplining employee for violating unlawful no-solicitation rule).

[54] 29 U.S.C. § 151.

[55] 29 U.S.C. § 157. *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 397 (1983) ("Employees of an employer covered by the NLRA have the right to form, join, or assist labor organizations.").

[56] *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937); *see also NLRB v. Dothan Eagle, Inc.*, 434 F.2d 93, 98-99 (5th Cir. 1970) ("the exercise of free choice by the employees . . . is an important raison d'etre of contemporary labor policy.").

[57] *See NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1427 (11th Cir. 1998) (discharges during union campaign send "a powerful message of deterrence to other potential union supporters."); *Piggly Wiggly, Tuscaloosa Div. Commodores Point Terminal Corp. v. NLRB*, 705 F.2d 1537, 1542 (11th Cir. 1983) ("blitz-like attack" on organizing campaign, including discriminatory discharge of employees, resulted in "substantially dissipating" union's majority status); *see also Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 971 (6th Cir. 2001); *Pye v. Excel Case Ready*, 238 F.3d 69, 74-75 (1st Cir. 2001); *Sharp v. Webco Indus., Inc.*, 225 F.3d 1130, 1135 (10th Cir.

derail employee activities in support of the Union.[58] Moreover, the remaining employees, particularly those who were undecided about the Union, will often refrain from supporting the Union or engaging in other concerted activities for fear that they will suffer the same fate.[59] The risk of irreparable harm is even more acute where, as here, an employer engages in additional unlawful conduct in support of its antiunion campaign.[60] Here, Respondent compounded the harm caused by its discharge of 13 Union supporters by also, through their highest-level officials, making additional coercive statements and threats to employees in connection with their

2000); *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1572-73 (7th Cir. 1996), *cert. denied*, 519 U.S. 1055 (1997); *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 749 (9th Cir. 1988), *overruled on other grounds by Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994); *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1053 (2d Cir. 1980).

[58] *See S. Lichtenberg & Co.*, 952 F.2d at 370, 373-74 (where union was recently certified, discharge of employees that included "lodestars of the initial organizational efforts" substantially undermined support for the union); *NLRB v. Longhorn Transfer Serv., Inc.*, 346 F.2d 1003, 1006 (5th Cir. 1965) ("[T]he discharge of a leading union advocate is the most effective method of undermining a union organizational effort."); *W. Mich. Plumbing & Heating, Inc.*, 250 F.3d at 971 (without reinstatement of discriminatee, "there would be no one at the Company organizing for the union"); *Excel Case Ready*, 238 F.3d at 75 ("The absence of key union organizers can contribute to the erosion of support for a nascent union movement."); *Electro-Voice, Inc.*, 83 F.3d at 1573 (emphasizing harm caused by "the terminated employees' absence" because those employees were the "most active and most successful in organizing" before the employer "removed [them] from the work place").

[59] *See S. Lichtenberg & Co.*, 952 F.2d at 373 (following employer's unlawful conduct, employees were afraid to wear union insignia and participate in union activities); *Bandag, Inc. v. NLRB*, 583 F.2d 765, 772 (5th Cir. 1978) (unlawful discharges "live on in the lore of the shop and continue to repress employee sentiment. . . ."); *Excel Case Ready*, 238 F.3d at 74 ("discharge of active and open union supporters . . . risks a serious adverse impact on employee interest in unionization"); *Electro-Voice, Inc.*, 83 F.3d at 1573 ("[T]he employees remaining at the plant know what happened to the terminated employees, and fear that it will happen to them."); *Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575, 576 (2d Cir. 1988) ("Employees are certain to be discouraged from supporting a union if they reasonably believe it will cost them their jobs.").

[60] *See, e.g.*, *Electro-Voice, Inc.*, 83 F.3d at 1570 (explaining coercive impact of illegal conduct including solicitation of employee grievances, questioning employees about their union activity, and threatening plant closure).

organizing efforts.[61]

Indeed, Respondent's conduct has severely impeded the nascent organizing drive. At the hearing before Administrative Law Judge McKinney, discriminatee Cox testified that employees at Foxy Loxy felt intimidated due to Respondent's retaliatory discharges and were afraid that, if they engaged in Union activity, they would be next. Similarly, although discriminatee Ross testified that she tried to continue organizing after Respondent discharged strikers en masse on August 5, she could not make any headway. She found that remaining employees were unwilling to associate themselves with the Union because they feared retaliation by Respondent. This is unsurprising, given that lead Union organizer Ambrose's testimony at the hearing established that the Respondent's managers warned employees not to take part in any further strikes. In addition to chilling Union support among current employees through such illegal actions, Respondent has also stymied efforts by the lead Union organizers to reach those employees by banning the 13 discriminatees from its restaurants.

The employees' organizational effort is doomed unless the 13 discriminatees are immediately reinstated under the protection of an interim injunction. "[I]n the labor field, as in few others, time is crucially important in obtaining relief."[62] A final Board reinstatement order cannot revive employee interest in unionization because it will not come until years after the

---

[61] *See Piggly Wiggly*, 705 F.2d at 1543 (threats of plant closure linger for "a longer period of time"); *Bandag, Inc.*, 583 F.2d at 772 (threats to close up shop strike "directly at the heart of the security of the employees"); *NLRB v. Kaiser Agric. Chems., Div. of Kaiser Aluminum & Chem. Corp.*, 473 F.2d 374, 381 (5th Cir. 1973) (employer's message to employees through supervisors' statements "was clear" that if the employees unionized "existing benefits would go; no wage increases will be granted; resistance would be futile," and the effect of such statements was to "induce fear as to the consequences of the employees' union activities").

[62] *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 430 (1967).

discharges[63]—too late to erase their chilling effect.[64] By then, the remaining employees will have seen that workers who "attempted to exercise rights protected by the Act had been discharged" and waited for "years to have their rights vindicated."[65] Any returning discriminatees will have experienced a prolonged absence from the workplace as a result of their organizing activity.[66] At that point, no worker "in his right mind" will participate in a union campaign.[67] This is precisely the type of irreparable harm Section 10(j) was designed to address.[68] Further, by the time the Board issues its order, the discharged organizers will likely have taken other jobs and be unavailable for reinstatement, itself an irreparable injury to the unionization effort.[69] Thus, Respondent will have

---

[63] *See, e.g.*, *S. Lichtenberg & Co.*, 952 F.2d at 369 (noting that the "administrative machinery of labor dispute resolution moves slowly"); *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 570 (7th Cir. 2011) (noting the "notoriously glacial" pace of Board proceedings).

[64] *See Excel Case Ready*, 238 F.3d at 75 (unremedied interference with unionization effort "would make the Board's remedial process ineffective simply because it is not immediate"); *Electro-Voice, Inc.*, 83 F.3d at 1573 ("As time passes, . . . the spark to organize is extinguished.").

[65] *Silverman v. Whittall & Shon, Inc.*, No. 86-CV-1675, 1986 WL 15735, at *1 (S.D.N.Y. June 6, 1986); *see also J.P. Stevens & Co. v. NLRB*, 417 F.2d 533, 538 (5th Cir. 1969) (noting that a final Board reinstatement with backpay order is a "mild sanction [because] the backpay order's impact on the efforts of the remaining employees to organize is at best uncertain.").

[66] *See Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874, 881 (3d Cir. 1990) (even if open union supporters are "ultimately reinstated by the Board . . . [e]mployees will not risk the uncertainty and hardship attendant upon even temporary layoff that is the price they must pay for union activity"); *Angle v. Sacks*, 382 F.2d 655, 660-61 (10th Cir. 1967) (when the Board finally acts, "the employees then at the plant may not wish to exercise the rights thus secured to them"); *Asseo v. Bultman Enters., Inc.*, 913 F. Supp. 89, 97 (D.P.R. 1995) ("Even those who remain willing to accept employment [under a final Board order] may be inclined to withdraw their support of the Union because of its inability to adequately represent their interests . . ..").

[67] *Whittall & Shon, Inc.*, 1986 WL 15735, at *1.

[68] *Excel Case Ready*, 238 F.3d at 75.

[69] *Id.*; *Electro-Voice, Inc.*, 83 F.3d at 1573; *Tomco Carburetor Co.*, 853 F.2d at 749.

succeeded in permanently frustrating its employees' right to freely engage in union activity.[70] The Board's order will be an "empty formality."[71]

Immediate reinstatement of the 13 discriminatees offers the best chance of avoiding this unjust outcome.[72] As Ross testified, interim reinstatement of the terminated discriminatees would reignite the organizing efforts at the Employers' restaurants.[73] Because fear of retaliation may completely extinguish employee willingness to support the Union by the time a Board order issues, interim reinstatement is necessary now to erase the chill before it is too late to prevent remedial failure.[74] It will mitigate the chilling effect on employees' willingness to engage in concerted activities by sending an affirmative signal that the Union, the Board, and the courts will more timely protect employees if they face retaliation for supporting the Union or engaging in concerted

---

[70] *Cf. NLRB v. Aclang, Inc.*, 466 F.2d 558, 562 (5th Cir. 1972) ("'The policy of the Act is to insulate employees' jobs from their organizational rights'") (quoting *Radio Officers' Union v. NLRB*, 347 U.S. 17, 40 (1954)); *Jones & Laughlin*, 301 U.S. at 34 ("collective action would be a mockery if representation were made futile by interference with freedom of choice.").

[71] *Sacks*, 382 F.2d at 660.

[72] *S. Lichtenberg & Co.*, 952 F.2d at 374 (ordering interim reinstatement where, after union won election and employer discharged nine union activists, support for the union had "fallen substantially" and created the risk "that the Board will never be able to restore the status quo"); *Sacks*, 382 F.2d at 661 (interim reinstatement is "best visible means" of rectifying chill of protected activity); *Kentov v. Point Blank Body Armor, Inc.*, No. 02–CV-61716, 2003 WL 253063, at *12 (S.D. Fla. Jan. 30, 2003) (ordering interim reinstatement where employer terminated all striking employees, about 80 to 100, because "[f]ailure to impose an injunction will likely lead to dissipation of union support over the time needed for the Board to complete its administrative process"), *order clarified*, 2003 WL 1955080 (S.D. Fla. Feb. 3, 2003).

[73] Ex. 10, Tr. 205

[74] *See S. Lichtenberg & Co.*, 952 F.2d at 373-74 (ordering reinstatement of nine pro-union employees); *W. Mich. Plumbing & Heating, Inc.*, 250 F.3d at 971 (one employee organizer); *Excel Case Ready*, 238 F.3d at 75 (five employee organizers); *Webco Indus., Inc.*, 225 F.3d at 1135 (six union supporters); *Tomco Carburetor Co.*, 853 F.2d at 746, 749 (11 members of organizing committee); *Sacks*, 382 F.2d at 660-61 (four employee organizers).

activities such as strikes.[75] Indeed, four of the 13 discriminatees still desire reinstatement, and the Union intends to resume organizing under the protection of an injunction.[76]

Furthermore, the passage of time does not obviate the need for interim injunctive relief. Before initiating Section 10(j) proceedings, the Board must be permitted sufficient time to "investigate and deliberate."[77] Moreover, any delay in this case is within the appropriate

---

[75] *See S. Lichtenberg & Co.*, 952 F.2d at 373-74; *Excel Case Ready*, 238 F.3d at 75 (interim reinstatement of union supporters appropriate to preserve "spark to unionize"); *Palby Lingerie, Inc.*, 625 F.2d at 1053 (reinstatement of "active and open" union supporters necessary to avoid "serious adverse impact on employee interest in unionization"); *Tomco Carburetor Co.*, 853 F.2d at 750 (interim reinstatement "would revive the union's organizational campaign"); *Webco Indus., Inc.*, 225 F.3d at 1135 (interim reinstatement "reasonably necessary to preserve the ultimate remedial power of the Board"); *NLRB v. Ona Corp.*, 605 F. Supp. 874, 886 (N.D. Ala. 1985) (ordering interim reinstatement of lead union organizer because revival of organizing campaign would be "virtually impossible" unless employees "are given an affirmative signal that further union activity" would not result in similar retaliation); *Murphy v. NCRNC, LLC*, 474 F. Supp. 3d 542, 561 (N.D.N.Y. 2020) (ordering interim reinstatement of activists, noting "[w]ithout timely relief, [the employer's] illegal actions will irreparably harm . . . the employees' right to choose representation . . . [The employer] will forever benefit from its illegal conduct.").

[76] Although only four of the 13 discriminatees have indicated that they currently desire to return to work for Respondent, all the discriminatees are entitled to consider offers of interim reinstatement under the protections of a Section 10(j) decree. *See Gottfried v. Mayco Plastics, Inc.*, 472 F. Supp. 1161, 1166 (E.D. Mich. 1979), *aff'd*, 615 F.2d 1360 (6th Cir. 1980) (table decision). Those offers, even if rejected, will send necessary reassurance to the remaining employees. *See Overstreet v. David Saxe Prods., LLC*, No.: 2:18-CV-02187, 2019 WL 332406, at *9 n.4 (D. Nev. 2019) (assigning little weight to whether the discriminatees wanted their jobs back because reinstatement also "sends a message to other employees that retaliatory discharges will be redressed"); *Heinrich Motors, Inc. v. NLRB*, 403 F.2d 145, 150 (2d Cir. 1968) (reinstatement offer has "dual purpose of protecting the discharged employee and demonstrating the [employer's] good faith to its other employees").

[77] *See Vibra Screw*, 904 F.2d at 881 (Board requires time to thoroughly investigate unlawful activity); *Spartan Mining Co.*, 570 F.3d at 539, 544-45 ("[c]omplicated labor disputes like this one require time to investigate and litigate"); *Maram v. Universidad Interamericana*, 722 F.2d 953, 960 (1st Cir. 1983) (the Board "cannot operate overnight"); *Aldworth Co.*, 124 F. Supp. 2d at 293 ("The Board must engage in careful investigation and deliberation before it petitions the court for 10(j) relief.") (citing *Konig*, 895 F. Supp. at 697).

parameters of other cases granting Section 10(j) injunctive relief.[78]

In any event, delay in seeking Section 10(j) relief should not necessarily prevent the Agency from seeking an injunction. Courts consistently have held that delay is important only if the parties cannot be returned to the status quo, such that a final Board order is likely to be as effective as interim relief.[79] Here, where four of the lead organizers are willing to accept interim reinstatement, it is not too late to restore the status quo. Hence, the passage of time has not yet "so weakened the Union that even interim relief could not salvage it."[80] Thus, "relief pursuant to § 10(j)" is "much more effective than waiting for a final Board order."[81] Most importantly, using "delay as the basis to deny the requested injunctive relief punishes the wronged employees … an

---

[78] *Compare, e.g.*, *Hirsch v. Dorsey Trailers*, 147 F.3d 243, 248-49 (3d Cir. 1998) (Region's 14-month delay in seeking 10(j) relief did not bar injunction); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 856 (5th Cir. 2010) (injunction affirmed despite 19-month passage of time between initial complaint and 10(j) petition); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 544–545 (4th Cir. 2009) (18-month passage of time between issuance of complaint and request for relief under 10(j) did not render injunction inappropriate).

[79] *See, e.g.*, *McKinney v. Ozburn-Hessey Logistics, LLC*, No. 2:14–CV–02445, 2015 WL 480675, at *12-13 (W.D. Tenn. Jan. 29. 2015) ("rather than considering the number of days or months which have passed between the issuance of complaint and the seeking of Section 10(j) relief, . . . the appropriate focus is on whether it is necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA, and whether achieving status quo is possible.") (quoting *Gottfried v. Frankel*, 818 F.2d 485, 495 (6th Cir. 1987)), *aff'd in relevant part*, 875 F.3d 333, 341-42 (6th Cir. 2017); *Fernbach v. Sprain Brook Manor Rehab, LLC*, 91 F. Supp. 3d 531, 545-46 (S.D.N.Y. 2015) (the Second Circuit has said that it "certainly reject[s] the notion that the passage of time, alone, is sufficient to justify rejecting a section 10(j) petition") (citations omitted); *Pate v. Bodega Latina*, No. 15-CV-4228, 2015 WL 12661924, slip op. at 6-7 (C.D. Cal. July 30, 2015) (recognizing that it must afford the NLRB "a certain leniency" regarding delay because it needs "a reasonable period of time to investigate, deliberate, and authorize the filing of a § 10(j) action" and therefore delay "is only significant if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order is likely to be as effective as an order for interim relief.").

[80] *S. Lichtenberg & Co.*, 952 F.2d at 374.

[81] *Id.* (distinguishing *Pilot Freight*, 515 F.2d at 1193).

unacceptable outcome."[82]

This case is thus distinguishable from *NLRB v. Hartman & Tyner, Inc.*, 714 F.3d 1244, 1249-50 (11th Cir. 2013), where the Eleventh Circuit concluded a district court did not abuse its discretion when it found that interim reinstatement was not just and proper because the union organizing campaign had already "grown cold" before the discharge of six union supporters and it was therefore "not apparent from the record that the discharges themselves had a clear chilling effect." Here, the organizing campaign was gaining momentum before Respondent's unlawful discharges effectively stopped it in its tracks. Before those discharges, Union supporters collected roughly 40 authorization cards, drafted and delivered to the Respondent a letter collectively demanding better working conditions, and organized a successful one-day strike. But the record shows that the Respondent's mass discharge of pro-Union employees significantly chilled Union support among remaining employees who now fear they could suffer similar retaliation. Although there has been some delay in seeking Section 10(j) relief in this case, as in *Hartman & Tyner*, employee testimony shows such delay will not be fatal to the Union campaign if interim reinstatement restores Union supporters to the workplace where they can continue their organizing efforts.

The other requested temporary relief is also equitably necessary. Respondent's employees will not feel free to exercise their statutory rights absent interim rescission of its overbroad Social Media policy[83] and the discriminatory write-ups issued to Ross on August 9 and September 19,

_____

[82] *Moore-Duncan v. Laneko Engineering Co.*, No. 03-CV-6306, 2003 WL 23139070, *3 (E.D. Pa. Dec. 23, 2003) (citation omitted).

[83] *See, e.g.*, *Frankl v. Adams & Assocs., Inc.*, 74 F. Supp. 3d 1318, 1326, 1329 (E.D. Cal. 2015) (requiring rescission of employer's rule barring discriminatee from its property); *D'Amico v. U.S. Serv. Indus., Inc.*, 867 F. Supp. 1075, 1096, 1102 (D.D.C. 1994) (enjoining unlawful no-solicitation rules and policies); *Chavarry v. E.L.C. Elec., Inc.*, No. 1:04–CV–123, 2004 WL 2137644, at *8 & n.7 (S.D. Ind. June 29, 2004) (requiring rescission of unlawful rules).

2023.[84] A broad cease-and-desist order is necessary to deter future violations of the Act and protect future organizing because Respondent has engaged in "egregious" misconduct—particularly the unlawful mass discharge of 13 employees—"demonstrating a general disregard for [] employees' fundamental statutory rights."[85] Posting the district court's order during the pendency of the administrative proceedings, along with electronic distribution of the order, will further inform employees that they are free to exercise their statutory rights without fear of retaliation.[86] Finally, reading of the district court's order by a responsible agent of Respondent or a Board agent is an "effective but *moderate* way to let in a warming wind of information and, more important, reassurance."[87]

---

[84] *See, e.g.*, *Blyer v. Domsey Trading Corp.*, No. 91-CV-1304, 1991 WL 150817, at *2 (E.D.N.Y. July 25, 1991) (ordering interim rescission of warnings and other discriminatory discipline); *Crawford v. Env't Waste Disposal, Inc.*, 568 F. Supp. 22, 27-28 (N.D. Ill. 1983) (warnings); *Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147, 1155 (D. Mass. 1983) (same), *aff'd mem.*, 725 F.2d 664 (1st Cir. 1983).

[85] *Frankl,* 693 F.3d at 1061; *see also Sacks*, 382 F.2d at 657-58, 660-61 (order enjoining an employer from "in any way" interfering with employees' Section 7 rights was appropriate where evidence showed employer unlawfully discharged six employee organizers, granted a wage increase to other employees, and interrogated and threatened employees); *Paulsen v. PrimeFlight Aviation Servs., Inc.*, 718 F. App'x 42, 45 (2d Cir. 2017) (summary order); *Garner v. MacClenny Prod., Inc.*, 859 F. Supp. 1478, 1484 (M.D. Fla. 1994) (ordering broad cease-and-desist); *Goonan v. Amerinox Processing, Inc.*, 1:21-cv-11773, 2021 WL 2948052, at *9 (D.N.J. July 14, 2021) (same); *Denholm v. Smyrna Ready Mix Concrete, LLC*, No. 5:20-CV-320, 2021 WL 297571, at *12 (E.D. Ky. Jan. 28, 2021) (same).

[86] *See, e.g.*, *Diaz ex rel. N.L.R.B. v. AC Specialists, Inc.*, No. 8:12–CV–1410, 2012 WL 4479040, at *4 (M.D. Fla. Sept. 28, 2012) (ordering posting); *Hooks v. Ozburn-Hessey Logistics, LLC*, 775 F. Supp. 2d 1029, 1054 (W.D. Tenn. 2011) (same); *Muffley v. APL Logistics Servs. Inc.*, 2008 WL 4561573, at *2 (W.D. Ky. Oct. 10, 2008) (same).

[87] *United Nurses Assocs. of Cal. v. NLRB*, 871 F.3d 767, 788-89 (9th Cir. 2017); *see also Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176, 1206-07 (D. Haw. 2010) (ordering reading of court order), *aff'd*, 650 F.3d 1334 (9th Cir. 2011); *AC Specialists, Inc.*, 2012 WL 4479040, at *4 (ordering reading of district court's order); *Amerinox Processing*, 1:21-CV-11773, 2021 WL 2948052, at *9

## C. The Balance of the Equities and the Public Interest Favor Interim Relief

As demonstrated above, offering reinstatement to the 13 discriminatees is crucial to protecting employees' statutory rights, reinvigorating organizing efforts at Respondent's restaurants, and safeguarding the Board's remedial authority. In contrast, any harm to Respondent from a temporary injunction is slight.[88] Respondent will receive the benefit of the reinstated employees' experience[89] while maintaining the right to discipline those employees in a nondiscriminatory manner where appropriate.[90] In the event Respondent has hired other employees to fill the discriminatees' former positions, it is well-settled that the Section 7 rights of discriminatees to interim reinstatement under Section 10(j) outweigh the job rights of their replacements.[91] Further, any harm Respondent might suffer as a result of a temporary injunction "will only last until the Board's final determination."[92] Accordingly, the balance of hardships tips sharply in favor of granting temporary injunctive relief.

Finally, the public interest will be best served by granting interim injunctive relief in this

---

(same); *Fernbach v. Sprain Brook Manor Rehab, LLC*, 91 F. Supp. 3d 531, 550 (S.D.N.Y. 2015) (same); *Calatrello v. Gen. Die Casters, Inc.*, No. 1:10-CV-2421, 2011 WL 446685, at *8 (N.D. Ohio Jan. 11, 2011) (same); *Garcia v. Sacramento Coca-Cola Bottling Co.*, 733 F. Supp. 2d 1201, 1218 (E.D. Cal. 2010) (same).

[88] *See Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 182 (1941) ("Protection of the workers' right to self-organization does not curtail the appropriate sphere of managerial freedom; it furthers the wholesome conduct of business enterprise.").

[89] *See Eisenberg v. Wellington Home Nursing Home*, 651 F.2d 902, 906 (3d Cir. 1981).

[90] *Id.*; *Excel Case Ready*, 238 F.3d at 73, 75; *Electro-Voice, Inc.*, 83 F.3d at 1573.

[91] *See Excel Case Ready*, 238 F.3d at 73, 75; *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 300 (7th Cir. 2001); *Tomco Carburetor Co.*, 853 F.2d at 750; *Wellington Nursing Home, Inc.*, 651 F.2d at 906.

[92] *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 28 (1st Cir. 1986).

case. The public has an interest in "prevent[ing] frustration of the purposes of the Act."[93] Interim relief will preclude Respondent "from using unfair labor practices in the short run to permanently destroy" its employees' interest in unionizing and collective bargaining.[94] It is also plainly in the public interest to ensure that Respondent complies with federal law.[95]

In sum, injunctive relief is equitably necessary here to vindicate the will of Congress by encouraging collective bargaining, protect employees' Section 7 rights, and preserve the Board's remedial power.

## VI. <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the relief prayed for in the petition because, on balance, an onerous burden on Respondent is not being requested and any burden on Respondent is easily outweighed by the important public policy in protecting employees in the exercise of their statutory rights.

Dated this 19th day of December 2024.

Respectfully submitted,

JILL E. STEINBERG
United States Attorney
Southern District of Georgia

<u>s/ Bradford C. Patrick</u>
BRADFORD C. PATRICK

---

[93] *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 39 (2d Cir. 1975); *Pan Am. Grain. Co.*, 805 F.2d at 28 ("[T]he public has an interest in ensuring that the purposes of the Act be furthered.").
[94] *Excel Case Ready*, 238 F.3d at 75; *see also HTH Corp. I*, 650 F.3d at 1365 ("In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed . . ..").

[95] *Avanti Health Sys.*, 661 F.3d at 1197 (citing *N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010) ("[I]t is obvious that compliance with the law is in the public interest.")).

Assistant U.S. Attorney
Southern District of Georgia
South Carolina Bar No. 102092
P.O. Box 8970
Savannah, GA 31412
Phone: (912) 652-4422
Fax: (912) 652-4427
bradford.patrick@usdoj.gov


MATTHEW TURNER
Regional Director
National Labor Relations Board,
Region 10

*s/*Kurt Brandner
Kurt Brandner
Colorado Bar No. 50288
National Labor Relations Board
Region 10
401 W. Peachtree Street, NW
Suite 2201
Atlanta, Georgia 30308
(470) 343-7491
kurt.brandner@nlrb.gov